# THE PREROGATIVE COURT

OF

# THE STATE OF NEW JERSEY.

## OCTOBER TERM, 1883.

THEODORE RUNYON, ESQ., ORDINARY.

ANNIE DOWNIE, appellant,

*v.*

ALLEN KNOWLES, administrator, respondent.

An administrator and administratrix found a sum of money in their intestate's safe, and counted, it twice, and it was taken by the administrator. The inventory, signed by both, contained but one item of cash, stated as " purse, $692.12." In 1877, the administratrix was removed from her trust because of her marriage and failure to give bonds thereafter. In 1878, the administrator filed his account and charged himself with "cash on hand, not inventoried, $5,235.31." The testimony of the administratrix showed that the amount found in the safe was $7,555; that of· the administrator was rendered incredible by the place, the character and the amount of his entry of the transaction in his account-books.—*Held*, that he must account to the estate for the $2,319.68, with interest.

On appeal from the decree of the orphans court of Passaic county.

*Mr. E. Stevenson,* for appellant.

*Mr. G. S. Hilton* and *Mr. H. A. Williams,* for respondent.

THE ORDINARY.

Sam Thompson, late of Paterson, in this state, died on the 9th of April, 1877, leaving a widow and three infant children. On the 18th of the same month, letters of administration of his estate were granted to his widow, the appellant, and Allen Knowles, the respondent. They filed an inventory of the estate on the 23d of the same month. In July of the same year the appellant was married to Robert Downie, and on or about the 28th of December following, she was removed from her office of administratrix on her failure to give bonds as required by the statute, because of her remarriage. At the term of April, 1878, the respondent filed his intermediate account, which was allowed at the same term, and at the April term, 1880, he filed another intermediate account, which was also allowed. The inventory amounted to $11,558.89. It contained but one item of cash, stated as "purse, $692.12." In the first intermediate account the respondent charged himself with "cash on hand not inventoried, $5,235.31," and in the second he charged himself with the balance appearing against him on the settlement of the first account. On the 18th of November, 1881, the appellant filed her petition in the orphans' court, alleging that the charge of the amount of cash not inventoried was incorrect, and stating that it represented cash found in the safe of the intestate and not inventoried, and that the true amount with which the respondent ought to have charged himself was $7,555 instead of $5,235.31, and praying that he might be required to charge himself with the amount of $2,319.68, the difference between the two sums. The matter was heard by the orphans court, at considerable length, on testimony, and the prayer of the petitioner was denied and the petition dismissed. From the decree declaring the judgment of the court in the matter, this appeal is brought.

As will have been seen, the question between the parties is as to the amount of money which was found in the safe and not inven-

toried.   The only witnesses to the finding of the money and the counting of it, are the parties to this litigation.   To this they both agree, but differ as to the time when the money was found and the amount; the appellant alleging that the money was found on the day on which the appraisement was made and before the appraisers came, and the respondent that it was not found until about a month after that occasion, and on the 14th of May.   The appellant testifies that on the morning the inventory was made the respondent came to her house about eight o'clock, and requested her to come down stairs, if she was able to do so (she was then sick abed), to open the safe; that she arose and her nurse dressed her, and the respondent and the nurse brought her down stairs where the safe was, and that she then gave the respondent the keys of the safe, and he opened the drawer and took out $7,555.   She says he laid the money in her lap when he took it out of the safe; that some of it was rolled up and some lay out flat, just as it would come from the bank; that after she received it in her lap the respondent went and got a newspaper from under the lounge-cushion and wrapped all the money up in the paper and put four india-rubber straps around it and two across it, and told her to take it up stairs into her bed-room, and that he said if the money got to the orphans court they would scatter it all away, and he thought that her husband meant the money for her.   She says she put the money in her pocket, according to his advice, and took it away with her to her bed-room; that after she had got into her bed the respondent and she counted over the money on the bed where she was lying, and there were $7,055 of it, he having left $500 of the money in the safe; that he made it up into a package again and laid the package under her pillow, and then went to the quarry at Haledon with Mr. Garside, one of the appraisers; that before he went to the quarry he removed the package from the bed, being apprehensive lest the nurse should see it, and placed it under the bureau in the room, where it remained until after the inventory was taken, and that in the afternoon he came again into her room and counted the money over and then took it down, and, as she supposed, put it in the safe.   She swears that

he counted over the bills and laid them on the bed, and that she counted them, too, with him; that there were $4,000 in rolls, as he got it from the safe; that she thinks that when the respondent took the money down to put it into the safe, as she supposed, he made figures, stating the amount, on a small piece of brown paper with a pencil, and said to her: "I have put it here—the amount—on this piece of paper; I will take this down and put it in the safe with the money." She swears that when the money was counted on the bed there were $7,055 of it, $500 having been left by the respondent in the safe, because, he said, it would not look right to take all the money out of the safe. She swears positively as to the amount of money which was found in the drawer; that there were $4,000 in bills in rolls, and $3,555 in bills in flat packages. The bills appear to have been of large denominations, and, according to the testimony on the subject, it would appear that in bulk they would have made a package not too large to be carried, as she swears she carried it, in her pocket from the safe to her bed-room up stairs. The respondent, on the other hand, while he admits the finding of the money in the drawer in the safe, and that it was not inventoried, denies the truth of the entire statement of the appellant, not only as to the time of the finding, but as to the amount and the circumstances. He says that the drawer in which the money was found was one which could not be opened, because of the loss of the key; that the key was not found until about the middle of May, and when it was found he and the appellant went to the safe together, and opened the drawer with the key and found the money; that they counted it twice over; that the first time they differed as to the amount, and that it was counted again and they agreed that the amount was, as he thought, $4,250; that he entered the amount, immediately on finding the money, in his day-book, and it appears to have been entered under the date of the 14th of May. The entry is in red ink, and is in addition to and below another one of the same date in black ink. The latter entry is an entry of a payment made of a bill on account of the estate. He says the reason why the entry of the amount found in the safe was made in red ink was, that he was somewhat agitated about finding

·the money and not having put it in the inventory, and he says he might have dipped his pen in the wrong ink-bottle, and that he does not know of any other reason why the entry is in red ink. He swears positively, however, that he made the entry in ·the day-book at the very time when the money was found, which, he says, was on the 14th of May. He produces, also, an entry made in his diary under the same date, which, he says, was made at the same time. That entry is as follows: "Found the key of safe-drawer and in the same." The amount found is not stated in the diary. In his ledger the charge in the day-book is posted by interlining at the top of the page the entry—"Found in safe-drawer $4,250," between charges of May 16th and 17th, 1877. The amount is also entered 'at the top of each of the two following pages. There is nothing in the case to discredit the appellant's testimony except the respondent's flat denial, and the fact that she, with him, swore to the inventory.

As to this latter objection to her testimony, the fact that she was wholly unacquainted with business, and especially with the settlement of estates and what was required of her as administratrix, is to be taken into account, and it is not strange, therefore, that she should, under the circumstances, as she details them, have made the oath to the inventory, notwithstanding the fact that if her story be true, about $7,000 of cash were withheld from the inventory; and it does not appear that she was in anywise aware that there was anything reprehensible in withholding the money from the inventory; but on the other hand, according to her testimony, she relied and acted upon the advice of the respondent, trusting to his knowledge of what was right and proper to be done in such matters, as to which she was wholly ignorant. As against the statement of the respondent in regard to the amount of money found in the safe, stands the fact that by his own admissions the entry in his book was erroneous, nearly $1,000 less than it ought to have been. It appears that his attorney, in making up his first account, discovered that, according to the bank-books which showed the money on deposit belonging to the estate, the respondent had nearly $1,000 more in his hands than was shown by his account, and the only explana-

tion which the respondent could offer for the discrepancy was that there must have been a mistake in the counting of the money when it was taken from the safe. The respondent testifies, it will have been seen, that when the money was taken from the safe, it was twice counted over by him and the appellant; that on the first count they differed as to the total amount, but that on the second they agreed, and that the amount so agreed upon was $4,250. In his intermediate account he charged himself with $5,235.31 instead of $4,250 only. It appears, then, according to his own admissions, that his statement in his books, that the amount of money found in the safe was only $4,250, was an error. Nor does his testimony on the subject of the entries made in his books appear to be worthy of confidence. Though on his direct examination he swears that he made the entry in his day-book at the time the money was found, on the cross-examination he says he cannot tell when the entry was made, nor about what time; that he cannot tell within a month, and he admits that it was not made on the day when the money was found. It is evident that the entries of the $4,250 in the ledger were all made after the 20th day of August, 1877. This is apparent from the footings of the columns at the head of which they appear. It is also extremely noteworthy that part of each one of those entries —the first two figures (42) in each—are written over an erasure, and it appears, by a close examination of the first of these entries, that part of it is written over an entry, which has been erased, of a sum which seems to have begun with the figure " 7." *Ledger p. 62.* The testimony of the respondent in regard to the entries is so contradictory, and the entries themselves are of such a suspicious character as not only to render them wholly unworthy of credit, but to deprive his denial of the truth of the appellant's statement of all weight. In this connection it should be remarked that the respondent, after the filing of the inventory, made inquiry of Judge Daggers, who was one of the sureties on the administration bond, as to what ought to be done by an administrator in reference to money found by him after the making of the inventory, and received instructions from Judge Daggers on that subject. He did not state the amount that he found, nor

did he indeed state that he had found any money since the making of the inventory. In his entry in his diary, he made no mention, as before stated, of the amount found in the safe. It appears strange that he should have omitted to insert in this memorandum in his diary the important fact, what the amount of money was which was found in the safe, and should have contented himself with merely entering the fact of the finding of the key. And further, to show the unreliability of his testimony in reference to the entry in the day-book, he says that it means that $4,250 was the amount of the money that was found in the safe, *as near as he could recollect, when he put it down.* It is impossible to conclude that this administrator has rendered a satisfactory account of the money found by him in the safe, whether found at the one time or the other. It is laid down that where a trustee has kept his accounts in a negligent way, or has kept no account whatever of his receipts, all presumptions should be strongly against him, and obscurity and doubts should not operate to his advantage, but adversely. *Blauvelt* v. *Ackerman, 8 C. E. Gr. 495, 10 C. E. Gr. 570.* And again, that trustees are bound to keep clear and accurate accounts, and in case doubts or obscurities arise from their failure to do so, they should be resolved against the trustees, and if the accounts of a trustee become lost, through his carelessness, he should be required to bear any injurious consequences arising from their loss, and that the law imposes the duty of keeping accounts on trustees for the protection of their *cestuis que trust,* and a trustee will not be permitted to defeat this salutary purpose by his carelessness. *Gaston's Trust, 8 Stew. Eq. 60 ; affirmed on appeal, Id. 348.*

Where, as in this case, the trustee's accounts are not only untrustworthy, but of a most suspicious character, there is all the more reason for holding that the presumptions are against him. It is obvious that the testimony introduced in this case on the part of the respondent in support of his general reputation for truth and veracity, honest dealing and good standing in the community, was entirely incompetent. It may be remarked that there was no attempt on the part of the appellant to show the contrary.

Judged by the rules of human conduct applicable to such matters, the respondent has made himself singularly liable to adverse conclusions. An administrator who, after he has made his inventory, finds a large amount of money, with which he knows he is chargeable, would ordinarily, if desirous of dealing fairly with the estate, not only make no concealment of the fact or of the amount found, but would make haste to make both known at the earliest moment, and take pains, as well in justice to the estate as for his own protection, to establish the amount of his liability; and he would, at least in his accounts, make such entries as not only would not invite suspicion and discredit, but would secure to him the benefit of the presumptions which the court is always ready to extend for the protection of the honest and careful trustee. Had the respondent called in some disinterested person to assist him in counting the money or to verify the result of his count, or if he had stated to Judge Daggers the fact that he had found the money, and what the amount was, or even if he had truly entered the amount in his books and kept his account in such a way as not to excite distrust, the case would have stood more favorably for him. But not only are his entries suspicious; they are admitted to be incorrect. He admits that the amount there stated by himself is too little by nearly $1,000, and he can only account for it by the suggestion that the error must have arisen from mistake in counting the money when it was taken from the safe. And yet he swears that he then counted the money twice over, both times with the aid of the appellant. It seems highly improbable that under the circumstances, as he states them, he could have made such a mistake. The appellant testifies positively, and her testimony appears to be credible. There is nothing to contradict it but the flat denial of the respondent, while there is very much to corroborate her.

The decree appealed from will be reversed, with directions to the court below to charge the respondent in his accounts with the difference between the amount accounted for and the amount found, according to the appellant's testimony, with interest thereon after the expiration of one year from the beginning of the administration. The respondent must pay the costs, both in the court below and in this court.